## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: _____

CAPITOL RECORDS, LLC and CAPITOL
CMG, INC.,

       Plaintiffs,

v.

JULIA MELLERSKI (a/k/a JULIA MILLER,
a/k/a J.L. MILLER, a/k/a JULIA
OSSENMACHER); JOHN MARK
OSSENMACHER; JASON JOHN
OSSENMACHER; TRANSFER TRUST, LLC;
and OWM, LLC,

       Defendants.

_____/

## COMPLAINT

Plaintiffs Capitol Records, LLC and Capitol CMG, Inc. (together, "Plaintiffs") hereby complain against Julia Mellerski (also known as Julia Miller, J.L. Miller and Julia Ossenmacher), John Mark Ossenmacher, Jason John Ossenmacher, OWM, LLC and Transfer Trust, LLC (collectively, "Defendants") as follows:

### Nature of the Action

1.    This is a proceeding supplementary under the Court's ancillary jurisdiction to enforce a judgment rendered in a different federal district (defined herein at paragraph 21 as the "SDNY Judgment") which Plaintiffs registered in the Southern District of Florida pursuant to 28 U.S.C. § 1963. Plaintiffs seek a judgment avoiding and recovering certain fraudulent transfers under Fla. Stat. §§ 56.29(9) and 726.101 *et seq.*, which Federal Rule of Civil Procedure 69(a)(1) makes applicable hereto.

2.    Plaintiffs hold the SDNY Judgment against defendant John Mark Ossenmacher (defined herein at paragraph 11 as "Ossenmacher") in the amount of $3,500,000 that is almost

entirely unsatisfied. By the time that Plaintiffs' judgment was entered against Ossenmacher on June 3, 2016, Ossenmacher had acquired the contractual right to purchase and to sell a locally well-known and valuable half-acre parcel of real estate in Palm Beach County, Florida, called "Hogarcito," that features a Mediterranean-style house built in 1921 by cereal heiress Marjorie Merriweather Post and her then-husband, financier E.F. Hutton. At the end of June 2016—a mere three weeks after a federal court in New York adjudged him liable to Plaintiffs for $3,500,000— Ossenmacher assigned his contractual rights to buy and sell Hogarcito to a Florida land trust. Ossenmacher created that land trust and made those assignments with the specific intent to hinder, delay and defraud his creditors, including Plaintiffs.

3.     As a result of his "flip" of the Hogarcito property, Ossenmacher realized a profit of approximately $3,447,564.13, nearly all of which ended up in his hands, directly or indirectly, or in the hands of his insiders, including his long-time co-habitating girlfriend, Julia Mellerski (alias Julia L. Miller, alias J.L. Miller, alias Julia Ossenmacher). Ossenmacher, with the assistance of a Florida lawyer, documented the buy-sell transactions to conceal his personal involvement with and interest in the property at issue, primarily by involving a land trust that had a remote, sham entity controlled by Ossenmacher as its sole beneficiary, and by causing his son to be the "front man" for the ultimate transaction. A demonstrative illustration of the way Ossenmacher's fraudulent scheme worked is attached hereto as **Exhibit 1**.

4.     Despite Ossenmacher's attempts to hide his personal interest in this asset, Plaintiffs discovered the truth in early 2020 as a result of post-judgment discovery from his former lawyer and others issued in a miscellaneous case pending in this federal district pursuant to 28 U.S.C. § 1963. Accordingly, Plaintiffs commence this ancillary enforcement action against Defendants to avoid Ossenmacher's fraudulent transfers and to recover their value—$3,447,564.13—plus pre-

and post-judgment interest as allowed by law, pursuant to the Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.101 *et seq.*, as made applicable to this proceeding supplementary by Fla. Stat. § 56.29(9).

## Jurisdiction and Venue

5.     This Court acquired ancillary jurisdiction to enforce the SDNY Judgment (as defined herein at paragraph 21) upon Plaintiffs' compliance with 28 U.S.C. § 1963 on February 12, 2019, which commenced the miscellaneous case in this federal district styled *Capitol Records, LLC, et al. v. ReDigi Inc., et al*, No. 9:19-mc-80208-BB (the "Judgment Registration Action").

6.     Pursuant to the Stipulation between the parties (as defined herein at paragraph 103), each of the Defendants has, among other things, consented to personal jurisdiction and venue in this federal district, and waived service of process.

7.     Because Plaintiffs have invoked the Court's ancillary jurisdiction, it is unnecessary to establish an independent statutory basis for venue. Nonetheless, the Southern District of Florida is an appropriate venue pursuant to 28 U.S.C. § 1391(b)(1), (b)(2) and (c)(2) because: (a) a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district; (b) a substantial part of property that is the subject of the action is situated in this judicial district; and (c) each of the Defendants is subject to personal jurisdiction here, either by domicile or consent.

## Parties

8.     Plaintiff Capitol Records, LLC ("Capitol Records") is a Delaware limited liability company with its principal place of business in Santa Monica, California. Capitol Records is also the successor-by-merger to Virgin Records IR Holdings, Inc. ("Virgin").

9.      Plaintiff Capitol CMG, Inc., formerly named Capitol Christian Music Group, Inc. ("CCMG"), is a California corporation with its principal place of business in Santa Monica, California.

10.     Defendant Julia Mellerski (also known as Julia Miller, J.L. Miller and Julia Ossenmacher) ("Mellerski") is a natural person who was domiciled in Palm Beach County, Florida during all events alleged herein. Upon information and belief, Mellerski currently resides in Corona Del Mar, Orange County, California.

11.     Defendant John Mark Ossenmacher ("Ossenmacher") is a natural person who was domiciled in Palm Beach County, Florida during all events alleged herein. Upon information and belief, Ossenmacher currently resides in Corona Del Mar, Orange County, California.

12.     Ossenmacher and Mellerski are not married to each other but have been significant others for many years, and hold themselves out to the public as a couple. Mellerski occasionally refers to herself, and/or suffers others to refer to her, as "Julia Ossenmacher."

13.     Defendant Jason John Ossenmacher ("Ossenmacher Jr.") is a natural person who, upon information and belief, is domiciled in Mission Viejo, Orange County, California. Ossenmacher Jr. is Ossenmacher's son.

14.     Defendant OWM, LLC ("OWM") is a limited liability company that, upon information and belief, does business in Florida.

15.     Defendant Transfer Trust, LLC ("Transfer Trust") is a Florida limited liability company. Ossenmacher and/or Ossenmacher Jr. were, during all relevant times, members of and/or the persons in control of Transfer Trust. Ossenmacher and/or Ossenmacher Jr. operated, conducted, engaged in and carried on the business of Transfer Trust.

### General Allegations

A.   **The SDNY Judgment against Ossenmacher**

16.      Plaintiffs are part of a well-known entertainment group engaged in the business of creating, manufacturing, distributing, selling, licensing and facilitating the distribution and sale of sound recordings in the United States. Plaintiffs are the copyright owners or owners of exclusive rights with respect to an extensive and diverse catalog of sound records, including exclusive rights under the Copyright Act, 17 U.S.C. § 106.

17.      On January 6, 2012, Capitol Records commenced a civil action against ReDigi, Inc. ("ReDigi") in the United States District Court for the Southern District of New York (the "Rendering Court"), styled *Capitol Records, LLC v. ReDigi, Inc.*, No. 12 CV 95 (RJS) (the "Copyright Litigation"). Subsequently, CCMG and Virgin became plaintiffs, and Ossenmacher personally became a defendant, in the Copyright Litigation.

18.      Ossenmacher was, during all events alleged herein, a founder and the president of ReDigi.

19.      In the Copyright Litigation, Plaintiffs alleged that ReDigi and Ossenmacher had committed multiple violations of the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, including direct copyright infringement, inducement of copyright infringement, contributory and vicarious copyright infringement and common law copyright infringement.

20.      In March 2013, the Rendering Court adjudged ReDigi (and, subsequently, Ossenmacher personally) to be liable to Plaintiffs on their claims for direct, contributory and vicarious infringement of Plaintiffs' distribution and reproduction rights in and to their copyrighted sound recordings.

21.     On June 3, 2016, the Rendering Court entered a stipulated judgment against ReDigi, Ossenmacher and another insider of ReDigi that, among other things, awarded Plaintiffs the sum of $3,500,000 in damages against ReDigi, Ossenmacher and the other defendant, jointly and severally (the "SDNY Judgment"). A true and correct copy of the SDNY Judgment is attached as **Exhibit 2**.

22.     The United States Court of Appeals for the Second Circuit affirmed the SDNY Judgment, and the Supreme Court of the United States subsequently denied the petition for a writ of certiorari to review the SDNY Judgment. The SDNY Judgment is thus final and subject to enforcement.

23.     The damages awarded to Plaintiffs remain almost completely unsatisfied.

24.     As a consequence of the SDNY Judgment, among other things—

(a)     Plaintiffs hold a "claim" within the meaning of Fla. Stat. § 726.102(4) against Ossenmacher in the amount of $3,531,173.28 (less credits and with post-judgment interest), and therefore Plaintiffs are each a "creditor" within the meaning of Fla. Stat. § 726.102(5); and

(b)     Ossenmacher is a "debtor" within the meaning of Fla. Stat. § 726.102(7), in that he is liable to Plaintiffs on the "claim" created by the SDNY Judgment.

**B.     The Golfview Road Property**

25.     There is situated in Palm Beach County, Florida real property commonly described as 17 Golfview Road, Palm Beach, Florida 33480 (the "Golfview Road Property").

26.     The Golfview Road Property, which is colloquially referred to as "Hogarcito," was built in 1921 by cereal heiress Marjorie Merriweather Post and her then-husband, financier E.F.

Hutton. The Golfview Road Property consists of a Mediterranean-style house situated on a half-acre parcel directly facing the Everglades Golf Course.

27.     From approximately April 2003 to on or about June 28, 2016, the Bruce Duval Bent Revocable Trust (the "Bent Trust") owned the Golfview Road Property. In June 2013, following the death of Bruce Duval Bent, who had been the trustee of the Bent Trust, James Van Stewart became the successor trustee of the Bent Trust (the "Bent Trustee").

###     C.     "The Digital Trust" is an alter ego of Ossenmacher

28.     Upon information and belief, at some point while the Copyright Litigation was pending, Ossenmacher began holding himself out to third parties as a representative of something he called "The Digital Trust" ("Digital Trust").

29.     The Digital Trust was, upon information and belief, neither a trust created under any state law nor an organized corporate form, but rather was an alias or pseudonym for Ossenmacher personally.

30.     The Digital Trust was also a fictitious name registered with the Florida Secretary of State owned by Central Fund Holdings, LLC ("CFH"), a Florida limited liability company. CFH is, upon information and belief, associated with Ossenmacher.

31.     Upon information and belief, Ossenmacher dominated and controlled CFH to such an extent that CFH's independent existence was, in fact, non-existent, and Ossenmacher was, in fact, the alter ego of CFH.

32.     Upon information and belief, during all events alleged herein: (a) CFH was owned by Ossenmacher; (b) CFH was not adequately capitalized; (c) CFH had no business purpose; (d) CFH had no employees or customers; (e) CFH was insolvent; (f) CFH did not observe corporate formalities or maintain books and records separate from Ossenmacher's personal books and

records; (g) CFH did not have finances separated from Ossenmacher's personal finances; and (h) Ossenmacher put funds in and took funds out of CFH for personal rather than corporate purposes. For those and other reasons to be proven at trial, CFH simply functioned as a façade for Ossenmacher.

33.     Ossenmacher used the corporate form of CFH, as obfuscated and concealed by the public use of the fictitious name "The Digital Trust," for the fraudulent and improper purpose of evading his creditors, including Plaintiffs, by concealing his personal involvement in transactions and negotiations, including the transactions involving the Golfview Road Property alleged herein.

34.     Recognizing CFH as a legitimate corporate form would cause injury to Plaintiffs, as it would enable Ossenmacher to evade their attempt to collect on the SDNY Judgment.

35.     All acts alleged herein to have been taken in the name of the Digital Trust were, or should be deemed to be, acts of Ossenmacher personally.

**D.     The 2014 Sale Contract**

36.     By early 2014, the Bent Trustee wanted to sell the Golfview Road Property.

37.     In approximately February 2014, Ossenmacher—referring to himself as the Digital Trust—made a written "confidential" offer to purchase the Golfview Road Property.

38.     This initial offer led to negotiations and discussions between Ossenmacher and the Bent Trustee. Despite Ossenmacher holding himself out as a representative of the Digital Trust, the Bent Trustee always believed that he was negotiating with Ossenmacher personally.

39.     At various points during these negotiations and discussions, Mellerski and the Bent Trustee communicated directly about the potential purchase, including about such matters as which items of personal property Mellerski wished to acquire as part of the transaction.

8

40.     On March 9, 2014, the Bent Trust, as vendor, and "The Digital Trust or Designee," as vendee, entered into that certain *Contract to Purchase Land Contract* (the "2014 Sale Contract"). A true and correct copy of the 2014 Sale Contract, as amended, is attached as **Exhibit 3**.

41.     Pursuant to the 2014 Sale Contract, the Digital Trust (i.e., Ossenmacher), or his designee, agreed to purchase the Golfview Road Property for $8.95 million as follows: (a) making a $100,000 down payment; (b) paying the balance of $8.85 million as a balloon, due on or before June 3, 2016 (the "Balloon Payment"); and (c) making the mortgage payments during the term of the agreement, for which Ossenmacher would receive a 50 percent credit at closing.

42.     Ossenmacher signed the 2014 Sale Contract in the presence of the Bent Trustee, at a location in Palm Beach County, Florida.

43.     At or around the time that Ossenmacher was arranging for the release of the $100,000 down payment to the Bent Trust, Ossenmacher asked the Bent Trust's real estate broker to sign a non-disclosure agreement. Ossenmacher made this request to conceal from his creditors, including Plaintiffs, his personal involvement with and interest in the Golfview Road Property. This was because, among other reasons, at the time that he signed the 2014 Sale Contract, the Rendering Court had already adjudicated Ossenmacher's company, ReDigi, liable for copyright infringement in the Copyright Litigation.

44.     On or about May 31, 2014, the Bent Trust delivered possession of the Golfview Road Property to Ossenmacher. Thereafter, Ossenmacher and Mellerski lived at, used and possessed the Golfview Road Property.

45.     From June 1, 2014 to March 1, 2016, Ossenmacher caused CFH to make all but three of the monthly mortgage payments for the Golfview Road Property in the amount of

$19,047.28 per month. An affiliate of Ossenmacher called "Digital Learning" made two of these mortgage payments, and Mellerski personally made one. This is but one example of Ossenmacher and Mellerski acting as a single economic unit.

46.     Plaintiffs' causes of action alleged herein arise out of or relate to, in whole or in part, Mellerski and Ossenmacher's use and possession of the Golfview Road Property.

     **E.**    **The 2016 Sale Contract**

47.     By October 2015, Ossenmacher had begun to consider attempting to sell the Golfview Road Property even though he did not yet own it. In the months that followed, Ossenmacher tried to persuade the Bent Trustee to allow him to market and sell the Golfview Road Property during the term of the 2014 Sale Contract.

48.     By January 2016, however, Ossenmacher was two months behind on the mortgage payments for the Golfview Road Property, and the June 3, 2016 deadline to make the Balloon Payment was fast approaching.

49.     By May 2016, Ossenmacher had found a buyer for the Golfview Road Property. The trouble was, Ossenmacher's rights under the 2014 Sale Contract were about to expire unless he made the Balloon Payment by June 3, 2016. Ossenmacher was unlikely to make that payment, however, as in May 2016 he was again two months behind on the mortgage payments for the Golfview Road Property.

50.     During May 2016, Ossenmacher asked the Bent Trustee several times, directly and through the Bent Trustee's counsel, to agree to extend the deadline for Ossenmacher to perform under the 2014 Sale Contract.

51.     By May 27, 2016, the Bent Trustee had still not agreed to extend Ossenmacher's deadline to perform under the 2014 Sale Contract. Nevertheless, on that day, Ossenmacher—this

time referring to himself as "Digital Trust J. John Ossenmacher"—entered into a contract to sell the Golfview Road Property to Thomas and Kristen Roberts (the "Roberts Buyers") for $12.9 million (the "2016 Sale Contract"), even though the Bent Trust still owned the property as of this date. A true and correct copy of the 2016 Sale Contract is attached as **Exhibit 4**.

52.     Upon information and belief, Ossenmacher signed the 2016 Sale Contract, and did so at a location within Palm Beach County, Florida.

53.     On or about June 1, 2016, the Bent Trust and Ossenmacher—again referring to himself as the Digital Trust—entered into that certain *Modification and Extension*, which extended the closing date under the 2014 Sale Contract to July 18, 2016, and required Ossenmacher to vacate the Golfview Road Property if the deal had not closed by July 31, 2016. A true and correct copy of the Modification and Extension is attached as **Exhibit 5**.

54.     Ossenmacher signed the Modification and Extension as "J. John Ossenmacher." Upon information and belief, Ossenmacher signed the Modification and Extension at a location in Palm Beach County, Florida. Ossenmacher signed the Modification and Extension using his son's name, Jason John Ossenmacher, to conceal Ossenmacher's involvement with and interest in the Golfview Road Property. In the alternative, Ossenmacher Jr. signed the Modification and Extension at Ossenmacher's request or direction to conceal Ossenmacher's involvement with and interest in the Golfview Road Property.

F.     **Ossenmacher conceals his interest in the Golfview Road Property**

55.     As of May 27, 2016—the date that Ossenmacher signed the 2016 Sale Contract— the SDNY Judgment would be entered against him only one week later, i.e., on June 3, 2016. Considering that the terms of the SDNY Judgment were negotiated and ultimately stipulated, Ossenmacher knew when he was concluding the 2016 Sale Contract that entry of the SDNY

Judgment against him—and the consequent creation of a massive debt payable to Plaintiffs—was imminent.

56.     So, Ossenmacher took further steps to conceal his involvement with and interest in the Golfview Road Property, and his ownership and control over the asset created by the 2014 and 2016 Sale Contracts. On May 27, 2016, for example, Ossenmacher instructed his real estate broker by email to "PLEASE KEEP, AND CAUSE TO KEEP, THIS TRANSACTION CONFIDENTIAL UNDER OUR PREVIOUS CONFIDENTIALITY AGREEMENT." Ossenmacher's email closes with "many thanks from us both," and is signed "the Digital Trust." Upon information and belief, "us both" was a reference to Ossenmacher and Mellerski.

57.     But by this time Ossenmacher had apparently concluded that he needed additional layers of protection to shield this asset from his creditors. By June 1, 2016, Ossenmacher—again referring to himself as the Digital Trust—had engaged a Florida attorney, Martin V. Katz ("Katz"), to be his attorney in connection with closing the transactions contemplated by the 2014 Sale Contract and the 2016 Sale Contract.

58.     Katz is an attorney licensed to practice law in the State of Florida, and maintains a law practice within Palm Beach County, Florida known as Katz & Doorakian Law Firm, P.L. Katz holds himself out to the public as an estate and tax planning attorney who has "more than thirty-five (35) years of experience" and "customiz[es] plans tailored to the needs of our clients … which include … asset protection."

59.     Because the SDNY Judgment had been or soon would be entered against him, Ossenmacher intended to document and structure the transactions contemplated by the 2014 Sale Contract and the 2016 Sale Contract so as to conceal from Plaintiffs the asset that was his interest in the Golfview Road Property.

60.     Ossenmacher's asset-protection scheme worked essentially as follows: He decided to consummate the transactions contemplated by the 2014 Sale Contract and the 2016 Sale Contract by using a Florida land trust to be buyer and seller, respectively. The land trust formation documents—which are not publicly available and specifically recite that they are not to be recorded—would name as the land trust's sole beneficiary a limited liability company of which Ossenmacher would be the sole member. Katz would be the public face of the land trust as its trustee, but Florida land records would not reveal who held its beneficial interest. Nor would Florida public records identify the members of the limited liability company that was to be the land trust's sole beneficiary. In this way, Ossenmacher—presumably acting on Katz's advice—created multiple layers of entities to distance himself personally from his interest in the Golfview Road Property, and enabled himself and his insiders to receive the proceeds from its sale while his creditors (principally Plaintiffs) were none the wiser.

### 1.     Formation of Transfer Trust

61.     On or about June 16, 2016, Katz organized Transfer Trust as a single-member Florida limited liability company with himself named as its manager and registered agent. A true and correct copy of the Articles of Organization and the Operating Agreement for Transfer Trust is attached as **Exhibit 6**.

62.     Katz and Ossenmacher created Transfer Trust to serve as a remote cash-management entity that enabled Ossenmacher to further conceal the cash resulting from the "flip" of the Golfview Road Property, and to facilitate Ossenmacher's movement of those cash proceeds to (or for the benefit of) himself, Mellerski and/or Ossenmacher Jr.

63.     The Operating Agreement for Transfer Trust was executed by "J. Ossenmacher" as its "member," and specified on Schedule A thereto that the address of "J. Ossenmacher" was 102

NE 2nd Street, #261, Boca Raton, Florida 33432. In his voluntary petition for relief under chapter 11 of the Bankruptcy Code, filed less than two months later, on August 3, 2016, Ossenmacher stated under penalty of perjury that his address was 102 NE 2nd Street, #261, Boca Raton, Florida 33432. Ossenmacher, therefore, was the sole member of Transfer Trust.

64.   Upon information and belief, Ossenmacher was the person in control of Transfer Trust.

### 2.   Formation of the Golfview Road Land Trust

65.   Next, Katz created the land trust to function as the buyer under the 2014 Sale Contract and the seller under the 2016 Sale Contract. On or about June 25, 2016, Katz (as trustee) and Transfer Trust (as beneficiary) enter into that certain *Florida Land Trust Agreement*, which created the 17 Golfview Road Land Trust ("Golfview Road Land Trust"), a land trust formed under the laws of the State of Florida. A true and correct copy of the Florida Land Trust Agreement is attached as **Exhibit 7**.

66.   Katz was, during all events alleged herein, trustee of Golfview Road Land Trust. Transfer Trust was the sole beneficiary of the Golfview Road Land Trust. (Ex. 7, at § 2(a).)

67.   "J. John Ossenmacher" signed the Florida Land Trust Agreement with Mellerski as a witness. The signature page PDF for the Florida Land Trust Agreement was emailed to Katz from "jossenmacher@gmail.com," an email address that is associated with Ossenmacher. So, upon information and belief, Ossenmacher signed the Florida Land Trust Agreement, or requested, directed or caused Ossenmacher Jr. to do so.

68.   As part of his scheme to conceal his personal involvement with and interest in the Golfview Road Property, Ossenmacher requested, directed or caused his son, Ossenmacher Jr., to sign certain documents, interface with Katz and generally act as the "front man" for both Golfview

14

Road Land Trust and Transfer Trust. Upon information and belief, Ossenmacher would also use his son's name to sign documents and send emails.

69.     These measures were intended to, and had the effect of, hindering, delaying and defrauding Plaintiffs. This was because, among other reasons, public records do not reveal what natural person has the economic or beneficial interest in a land trust, so a search of Florida land conveyance records would not have revealed that Ossenmacher—or his alter ego/pseudonym, Digital Trust—had an interest in the Golfview Road Property.

70.     Moreover, by naming a limited liability company as the sole beneficiary of the Golfview Road Land Trust, rather than Ossenmacher personally, and by causing Ossenmacher Jr. to be the public face or "front man" for those entities, Ossenmacher further concealed his involvement in the transaction, thus causing it to be more difficult for his creditors, such as Plaintiffs, to trace the transaction back to Ossenmacher.

**G.     Transfer Trust is the alter ego of Ossenmacher and/or Ossenmacher Jr.**

71.     Upon information and belief, Ossenmacher and/or Ossenmacher Jr. dominated and controlled Transfer Trust to such an extent that Transfer Trust's independent existence was, in fact, non-existent, and Ossenmacher and/or Ossenmacher Jr. were (or was), in fact, the alter ego(s) of Transfer Trust. In fact, Transfer Trust's only purpose was to act as the vehicle to deliver to Ossenmacher the lion's share of the cash proceeds from the sale of the Golfview Road Property.

72.     Upon information and belief, during all events alleged herein: (a) Transfer Trust was owned by Ossenmacher and/or Ossenmacher Jr.; (b) Transfer Trust was not adequately capitalized; (c) Transfer Trust had no business purpose; (d) Transfer Trust had no employees or customers; (e) Transfer Trust was insolvent; (f) Transfer Trust did not observe corporate formalities or maintain books and records separate from Ossenmacher's and/or Ossenmacher Jr.'s

personal books and records; (g) Transfer Trust did not have finances separated from Ossenmacher's and/or Ossenmacher Jr.'s personal finances; and (h) Ossenmacher and/or Ossenmacher Jr. put funds in and took funds out of Transfer Trust for personal rather than corporate purposes. For those and other reasons to be proven at trial, Transfer Trust simply functioned as a façade for Ossenmacher and/or Ossenmacher Jr.

73.     Ossenmacher and/or Ossenmacher Jr. used the corporate form of Transfer Trust for the fraudulent and improper purpose of evading Ossenmacher's creditors, including Plaintiffs, by concealing Ossenmacher's personal involvement in transactions and negotiations, including the transactions involving the Golfview Road Property alleged herein, and facilitating the movement of the cash proceeds of his "flip" of the Golfview Road Property to himself and/or to Ossenmacher Jr. Upon information and belief, Transfer Trust has carried on no business of any kind since it received those cash proceeds. Indeed, Florida Secretary of State records indicate that Transfer Trust stands administratively dissolved.

74.     Recognizing Transfer Trust as a legitimate corporate form would cause injury to Plaintiffs, as would enable Ossenmacher to evade their attempt to collect on the SDNY Judgment.

75.     All acts alleged herein to have been taken in the name of the Transfer Trust were, or should be deemed to be, acts of Ossenmacher and/or Ossenmacher Jr. personally.

**H.      The 2014 Sale Contract and the 2016 Sale Contract were "assets" that Ossenmacher "transferred"**

76.     On or about June 27, 2016, Ossenmacher—referring to himself as Digital Trust—assigned his rights under the 2014 Sale Contract to Katz in his capacity as trustee of the Golfview Road Land Trust (the "2014 Contract Assignment"). A true and correct copy of the 2014 Contract Assignment is attached as **Exhibit 8**.

77.     On or about June 28, 2016, Ossenmacher—referring to himself as Digital Trust—assigned his rights under the 2016 Sale Contract to Katz in his capacity as trustee of the Golfview Road Land Trust (the "2016 Contract Assignment"). A true and correct copy of the 2016 Contract Assignment is attached as **Exhibit 9**.

78.     The interest in the Golfview Road Property created by the 2014 Sale Contract and the 2016 Sale Contract were "assets" within the meaning of Fla. Stat. § 726.102(2), in that they were property of Ossenmacher, the debtor.

79.     The 2014 Contract Assignment and the 2016 Contract Assignment were "transfers" within the meaning of Fla. Stat. § 726.102(14), in that the assignments were modes by which Ossenmacher disposed of or parted with assets, namely his rights under the 2014 Sale Contract and the 2016 Sale Contract and his interest in the Golfview Road Property (together, the "Transfers").

80.     The Transfers were critical steps in Ossenmacher's plan to distance himself from, and conceal his interest in, the Golfview Road Property. Land conveyances in Florida are public record, so the Transfers enabled the purchase and sale of the Golfview Road Property to be carried out by an intermediary, Katz, who acted on behalf of a land trust that could not be traced back to Ossenmacher.

I.      **The Golfview Road Land Trust was a mere conduit for the Transfers**

81.     Katz and the Golfview Road Land Trust accepted and held the 2014 Contract Assignment and the 2016 Contract Assignment only to carry out Ossenmacher's direction as to how to dispose of the proceeds of the buy-sale transactions resulting from Ossenmacher's rights under the 2014 Sale Contract and the 2016 Sale Contract. The Florida Land Trust Agreement makes this clear. That agreement provides that Transfer Trust, as the sole beneficiary of the

Golfview Road Land Trust, had the exclusive powers "to direct the Trustee to deal with title to the [Golfview Road] Property" and "to manage, possess, use and control the [Golfview Road] Property, as well as the exclusive right "to receive the earnings, avails and proceeds from … sales and other dispositions of the [Golfview Road] Property." (Ex. 7, at § 2(b)(1)-(3).)

82.     At no time were Katz or the Golfview Road Land Trust free to exercise the rights conferred by, or dispose of the proceeds of the sale transactions resulting from, the 2014 Sale Contract or the 2016 Sale Contract as they saw fit. As to this, the Florida Land Trust Agreement states, in relevant part, that "the Trustee will deal with the Property including cash or other assets of any kind which may become subject to this Trust Agreement *only when authorized and directed to do so in writing by the Beneficiary [Transfer Trust]*." (Ex. 7, at § 21 (emphasis added).)

83.     Because Katz and the Golfview Road Land Trust lacked any dominion or control over the rights conferred by, or the proceeds of the sale transactions resulting from, the 2014 Sale Contract or the 2016 Sale Contract, the Golfview Road Land Trust was merely a conduit through which Ossenmacher made the Transfers to the transferees identified herein.

**J.      The closings under the 2014 Sale Contract and the 2016 Sale Contract**

84.     In the days leading up to the closings of the transactions contemplated by the 2014 Sale Contract and the 2016 Sale Contract, Ossenmacher's real estate broker admonished her colleagues to "be mindful of [the] confidentiality for this transaction." This was because Ossenmacher had caused his real estate broker to sign a non-disclosure agreement in connection with the broker's work for Ossenmacher.

85.     On or about June 28, 2016, the transaction contemplated by the 2014 Sale Contract closed. The Golfview Road Land Trust paid $8,727,850.31 to the Bent Trust to purchase the Golfview Road Property. On the day before the closing, the Bent Trustee, on behalf of the Bent

Trust, executed a warranty deed conveying title to the Golfview Road Property from the Bent Trust to the Golfview Road Land Trust. A true and correct copy of this warranty deed is attached as **Exhibit 10**.

86.     On the very next day—June 29, 2016—the transaction contemplated by the 2016 Sale Contract closed. 17 Golfview Road LLC, the entity the Roberts Buyers had formed to acquire title to the Golfview Road Property, wired $11,598,000, the balance due under the 2016 Sale Contract, to Katz, in his capacity as escrow agent for the transaction.

87.     On June 28, 2016, the day before the closing the transactions contemplated by the 2016 Sale Contract, Katz, as trustee of the Golfview Road Land Trust, executed a trustee's deed conveying title to the Golfview Road Property to 17 Golfview Road LLC. A true and correct copy of the trustee's deed is attached as **Exhibit 11**.

88.     As a result of the sale of the Golfview Road Property, the Golfview Road Land Trust received net proceeds of approximately $3,447,564.13. This was Ossenmacher's profit on the "flip" of the Golfview Road Property, which he realized about three weeks after being adjudged liable to Plaintiffs for $3,500,000.

### K.     **Disbursements from escrow**

89.     Also on June 28, 2016, Transfer Trust executed that certain *Disbursement Authorization* whereby it authorized and directed Katz's law firm, as escrow agent, to disburse the funds due to Golfview Road Land Trust, as seller under the 2016 Sale Contract, as follows: (a) to Mellerski, the sum of $1,350,000; (b) to OWM, the sum of $75,000; and (c) to a person who is not a defendant, the sum of $65,000. A true and correct copy of the Disbursement Authorization is attached as **Exhibit 12**.

90.     The Disbursement Authorization, which upon information and belief was executed by Ossenmacher (or Ossenmacher Jr. at Ossenmacher's request or direction), additionally stated that Ossenmacher would send instructions to Katz the following week as to whom to disburse the balance of sale proceeds held in escrow.

91.     On or about June 30, 2016, Katz—at Ossenmacher's direction—distributed the funds held in escrow in his law firm's client funds account for the benefit of the Golfview Road Land Trust as follows:

(a)     To Mellerski, the sum of $1,350,000 (the "Mellerski Disbursement");

(b)     To OWM, the sum of $75,000 (the "OWM Disbursement");

(c)     To a person who is not a defendant, the sum of $65,000; and

(d)     To Transfer Trust, the sum of $1,957,564.13 (the "Transfer Trust Disbursement").

A true and correct copy of the escrow account statement for the Golfview Land Trust is attached as **Exhibit 13**.

92.     The escrow account statement attached as Exhibit 13 identifies Katz's law firm's client as "Ossenmacher, John."

93.     Ossenmacher is, as alleged above, the sole member of Transfer Trust, so he personally obtained actual or constructive possession over the Transfer Trust Disbursement. In the alternative, Ossenmacher Jr. obtained actual or constructive possession over the Transfer Trust Disbursement. Accordingly, Plaintiffs' causes of action alleged herein arise out of or relate to, in whole or in part, the fact that Ossenmacher and/or Ossenmacher Jr. operated, conducted, engaged in and carried on the business of Transfer Trust, particularly its receipt of the Transfer Trust Disbursement.

94.     Moreover, as alleged above, Mellerski and Ossenmacher are a cohabitating couple, and function as a single economic unit. Accordingly, Ossenmacher also received actual or constructive possession over the Mellerski Disbursement.

**L.     Ossenmacher files chapter 11 bankruptcy**

95.     On August 3, 2016—a mere 34 days after receiving over $3.3 million from the "flip" of the Golfview Road Property—Ossenmacher filed a voluntary petition for relief under chapter 11 of title 11, United States Code, in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), as case no. 16-20810 (the "Bankruptcy Case"). A true and correct copy of Ossenmacher's bankruptcy petition, schedules and statement of financial affairs is attached as **Exhibit 14**.

96.     In his petition for relief filed in the Bankruptcy Case, Ossenmacher stated under penalty of perjury that his address was 102 NE 2nd Street, #261, Boca Raton, Florida 33432. (Exhibit 14 at 2.) That address, as alleged above in paragraph 63, is the same address listed on Schedule A to the Transfer Trust operating agreement identifying "J. Ossenmacher" as its sole member.

97.     One of the official bankruptcy forms that debtors must complete under penalty of perjury required Ossenmacher to identify if he had "any legal or equitable interest in," among other things, "[n]on-publicly traded stock and interests in incorporated and unincorporated business, including an interest in an LLC, partnership, and joint venture," and "[t]rusts." Ossenmacher failed to disclose his interests in Digital Trust, CFH, the Golfview Road Land Trust or Transfer Trust. (Exhibit 14 at 19-20.)

98.     One of the official bankruptcy forms that debtors must complete under penalty of perjury asked Ossenmacher whether "[d]uring the last 3 years, have you lived anywhere other than

where you live now?" in which response to which, Ossenmacher ticked the box "No." (Exhibit 14 at 44.) That was a lie. Ossenmacher failed to disclose that he lived at the Golfview Road Property between 2014 and 2016, which was within three years before the date that he filed bankruptcy.

99.     One of the official bankruptcy forms that debtors must complete under penalty of perjury asked Ossemacher "Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?" In response, Ossenmacher listed only a motor vehicle sale. (Exhibit 14 at 48.) That was a lie. Ossenmacher failed to disclose the 2014 Contract Assignment, the 2016 Contract Assignment and the ultimate sale of the Golfview Road Property to the Roberts Buyers.

100.    One of the official bankruptcy forms that debtors must complete under penalty of perjury asked Ossenmacher "Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?" in response to which, Ossenmacher ticked the box "No." (Exhibit 14 at 48.) That was a lie. Ossenmacher failed to disclose the 2014 Contract Assignment and the 2016 Contract Assignment, which, as alleged above, transferred his economic interest in the Golfview Road Property to a land trust of which he was a beneficiary.

101.    On November 17, 2017, the Bankruptcy Court dismissed the Bankruptcy Case, so Ossenmacher did not receive a discharge of his debts.

M.    **The Stipulation**

102.    Plaintiffs and Defendants, through their respective counsel, have conferred and agree that it would further the interests of judicial economy, promote comity and reduce costs if they litigated the claims asserted herein (the "Claims") as an ancillary enforcement proceeding

22

within or related to the Judgment Registration Action, and that doing so is authorized under 28 U.S.C. § 1963, Federal Rule of Civil Procedure 69(a)(1) and applicable state law.

103.    To that end, Plaintiffs and Defendants have entered into that certain *Stipulation Regarding Ancillary Enforcement Proceeding and Related Matters* (the "Stipulation"), which generally memorializes various agreements they have reached regarding litigation of the Claims. A true and correct copy of the Stipulation is attached as **Exhibit 15**.

104.    In the Stipulation, Plaintiffs and Defendants have stipulated and agreed, among other things, that:

(a)    This civil action is a proceeding supplementary to and in aid of judgment or execution within the meaning of Federal Rule of Civil Procedure 69(a)(1), and that the United States District Court for the Southern District of Florida has subject-matter jurisdiction to hear and determine this action;

(b)    Plaintiffs may, as part of or in connection with the Judgment Registration Action, commence proceedings supplementary under Fla. Stat. § 56.29 and file a complaint under Fla. Stat. § 56.29(9) that asserts the Claims and names all Enforcement Defendants as party-defendants therein;

(c)    The Claims are not barred by any statute of limitations or of repose, including without limitation, Fla. Stat. § 726.110, or relate back to the timely-filed Claims in actions commenced in Florida and California state court in June 2020; and

(d)    Each Defendant expressly waives service of summons and the complaint to be filed in this civil action, and submits to personal jurisdiction in the Southern District of Florida for all purposes in this civil action.

**Count I**

**Avoidance of Fraudulent Transfers (Actual Fraud)**
**Fla. Stat. §§ 726.105(1)(a), 726.108(1)(a), 726.108(1)(c)(1) and 726.108(2)**
**[Against all Defendants]**

105.    Plaintiffs reallege the allegations in paragraphs 1-104 as paragraph 105.

106.    Section 726.105(1)(a), Florida Statutes, states: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]"

107.    Plaintiffs are now and were at the time of the Transfers "creditors" within the meaning of Fla. Stat. § 726.102(5), and Ossenmacher is now and was at the time of the Transfers a "debtor" within the meaning of Fla. Stat. § 726.102(7).

108.    The 2014 Contract Assignment and the 2016 Contract Assignment are "transfers" within the meaning of Fla. Stat. § 726.102(14).

109.    Ossenmacher intended to hinder, delay and defraud Plaintiffs by transferring his interest in the Golfview Road Property to entities controlled by him, namely the Golfview Road Land Trust and Transfer Trust, after he had become indebted to Plaintiffs by virtue of the SDNY Judgment entered against him on June 3, 2016, and by concealing and obscuring his involvement in the purchase and sale transactions contemplated by the 2014 Sale Contract and the 2016 Sale Contract, respectively, leading to his realization of "flip" profit of $3,447,564.13.

110.    Plaintiffs did not discover these fraudulent transfers until January 2020, as the result of documents produced by Katz as compelled by subpoenas issued as part of the post-judgment enforcement proceeding styled *Capitol Records, LLC v. ReDigi Inc.*, No. 9:19-mc-80208-BB, pending before the United States District Court for the Southern District of Florida.

24

111.    Ossenmacher's fraudulent intent may, pursuant to Fla. Stat. § 726.105(2), be inferred because, among other reasons:

(a)    The Transfers were made to the Golfview Road Land Trust, which is an "insider" of Ossenmacher within the meaning of Fla. Stat. § 726.102(8) in that Ossenmacher was the person in control of that entity.

(b)    The vast majority of the value of the assets transferred as a result of the Transfers (i.e., the profit on the "flip" of the Golfview Road Property) went to "insiders" of Ossenmacher within the meaning of Fla. Stat. § 726.102(8) in that: (i) Mellerski, who co-habitates with Ossenmacher, the debtor, and maintains a close or special relationship with him, received the Mellerski Disbursement; and (ii) Ossenmacher Jr., to the extent that he was the person in control of Transfer Trust and thus had dominion or control over the Transfer Trust Disbursement, is Ossenmacher's son.

(c)    Ossenmacher retained control of the asset transferred following the Transfers in that he was the person in control of the Golfview Road Land Trust and directed Katz to whom to make the disbursements identified in paragraph 91, above.

(d)    Ossenmacher retained control of the vast majority of the value of the assets transferred as a result of the Transfers (i.e., the profit on the "flip" of the Golfview Road Property) in that: (i) Mellerski, who received the Mellerski Disbursement, co-habitates with Ossenmacher and operates as a single economic unit with him, such that Ossenmacher had dominion or control over the Mellerski Disbursement; and (ii) Ossenmacher is the sole member of Transfer Trust and thus was the person in control of it, he had dominion or control over the Transfer Trust Disbursement.

(e)     Ossenmacher went to great lengths to conceal his interest in the Golfview Road Property, including the Transfers and the value of the assets transferred as a result thereof, by, among other means: (i) using the pseudonyms "Digital Trust," "Digital Trust J. John Ossenmacher" and possibly others not known to Plaintiffs at this time in place of his actual name on documents and communications; (ii) requiring persons involved in the purchase and sale transactions, such as real estate brokers, to sign non-disclosure agreements or to otherwise keep information about those transactions confidential; (iii) upon information and belief, seeking legal advice from Katz—a lawyer who specializes in, among other things, "asset protection"—as to how to document and structure the purchase and sale transactions to evade detection by Plaintiffs and to hide the asset that was his interest in the Golfview Road Property; (iv) using a Florida land trust to consummate the transactions contemplated by the 2014 Sale Contract and the 2016 Sale Contract because Ossenmacher's name would not appear in public land records; (v) using a newly organized Florida limited liability company (i.e., Transfer Trust) as a remote cash-management entity to receive the majority of the economic benefit of the Transfers, as doing so created an additional "layer" between Ossenmacher personally and the parties to the transaction, and because the Florida Secretary of State's office does not publicly identify the members of a limited liability company; (vi) using his son, Ossenmacher Jr., as the public face or "front man" for the Golfview Road Land Trust and/or the Transfer Trust, when in reality Ossenmacher was actually the person in control of those entities; and (vii) giving false answers under penalty of perjury in his Bankruptcy Case to questions about his assets and financial affairs—including those alleged above in paragraphs 97-100—as truthful answers to those questions would have inevitably led to the discovery of Ossenmacher's purchase and sale of the Golfview Road Property, and realization of over $3.4 million in profit on its "flip" to the Roberts Buyers.

(f)       Before the Transfers occurred, Plaintiffs had named Ossenmacher as a defendant in the Copyright Litigation, potentially exposing him to significant personal liability. Moreover, in May 2016, when Ossenmacher realized that he might be able to "flip" the Golfview Road Property to the Roberts Buyers for a significant profit, Ossenmacher knew that entry of the SDNY Judgment against him was imminent, as the terms of that judgment were being negotiated with Plaintiffs at or around the same time and was ultimately entered by stipulation.

(g)       The Transfers occurred approximately 24 days after Ossenmacher incurred the $3,500,000 indebtedness created by entry of the SDNY Judgment against him.

112.     Because the Transfers constitute actual fraudulent transfers under Fla. Stat. § 726.105(1)(a), the Court should avoid them pursuant to Fla. Stat. § 726.108(1)(a). Plaintiffs are also entitled to: (a) an injunction under Fla. Stat. § 726.108(1)(c)(1) prohibiting Defendants from causing any further transfers of the cash proceeds of the Transfers; and (b) an order levying execution under Fla. Stat. § 726.108(2) on Ossenmacher, who is already Plaintiffs' judgment debtor.

### Count II

**Avoidance of Fraudulent Transfers (Constructive Fraud)**
**Fla. Stat. §§ 726.105(1)(b), 726.108(1)(a), 726.108(1)(c)(1) and 726.108(2)**
**[Against all Defendants]**

113.     Plaintiffs reallege the allegations in paragraphs 1-112 as paragraph 113.

114.     Section 726.105(1)(b), Florida Statutes, states: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation … (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: 1. Was engaged or was about to engage in a business or a transaction

for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

115.    The Transfers occurred approximately 24 days after Ossenmacher incurred the $3,500,000 indebtedness created by entry of the SDNY Judgment against him.

116.    Plaintiffs are now and were at the time of the Transfers "creditors" within the meaning of Fla. Stat. § 726.102(5), and Ossenmacher is now and was at the time of the Transfers a "debtor" within the meaning of Fla. Stat. § 726.102(7).

117.    Ossenmacher did not receive any value, let alone reasonably equivalent value, in exchange for the Transfers.

118.    Each of the Transfers either: (a) left Ossenmacher with remaining assets that were unreasonably small in relation to his obligations, particularly the $3,500,000 obligation created by the SDNY Judgment; and/or (b) was made when Ossenmacher voluntarily or involuntarily intended to incur, or believed or reasonably should have believed that he would incur, debts that he would not be able to pay as they came due.

119.    Thirty-four days after making the Transfers, Ossenmacher filed the Bankruptcy Case in which, among other things, Ossenmacher stated under penalty of perjury that he had $4,705.00 of assets against $6,845,431.00 of liabilities.

120.    Because the Transfers constitute actual fraudulent transfers under Fla. Stat. § 726.105(1)(b), the Court should avoid them pursuant to Fla. Stat. § 726.108(1)(a). Plaintiffs are also entitled to: (a) an injunction under Fla. Stat. § 726.108(1)(c)(1) prohibiting Defendants from causing any further transfers of the cash proceeds of the Transfers; and (b) an order levying

execution under Fla. Stat. § 726.108(2) on Ossenmacher, who is already Plaintiffs' judgment debtor.

## Count III

### Avoidance of Fraudulent Transfers (Constructive Fraud)
### Fla. Stat. §§ 726.106(1), 726.108(1)(a), 726.108(1)(c)(1) and 726.108(2)
### [Against all Defendants]

121.     Plaintiffs reallege the allegations in paragraphs 1-120 as paragraph 121.

122.     Section 726.106(1), Florida Statutes, states: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

123.     The Transfers occurred approximately 24 days after Ossenmacher incurred the $3,500,000 indebtedness created by entry of the SDNY Judgment against him.

124.     Plaintiffs are now and at the time of the Transfers were "creditors" within the meaning of Fla. Stat. § 726.102(5), and Ossenmacher is now and was at the time of the Transfers a "debtor" within the meaning of Fla. Stat. § 726.102(7).

125.     Ossenmacher did not receive any value, let alone reasonably equivalent value, in exchange for the Transfers.

126.     Each of the Transfers was made when Ossenmacher either was insolvent or became insolvent as a result of such Transfers.

127.     Thirty-four days after making the Transfers, Ossenmacher filed the Bankruptcy Case in which, among other things, Ossenmacher stated under penalty of perjury that he had $4,705.00 of assets against $6,845,431.00 of liabilities.

29

128.     The Transfers constitute constructively fraudulent transfers under Fla. Stat. § 726.106(1), and are therefore avoidable under Fla. Stat. § 726.108(1)(a).

### Count IV

**Recovery of Fraudulent Transfers**
**Fla. Stat. § 726.109(2)(a)**
**[Against all Defendants]**

129.     Plaintiffs reallege the allegations in paragraphs 1-128 as paragraph 129.

130.     Section 726.109(2)(a), Florida Statutes, states, in pertinent part, that to the extent that a transfer is avoided under Fla. Stat. § 726.108(1)(a), "the creditor may recover judgment for the value of the asset transferred … or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against: (a) The first transferee of the asset or the person for whose benefit the transfer was made …."

131.     As more specifically alleged in paragraphs 81-83, Golfview Road Land Trust was a mere conduit for the Transfers, and thus it is not a first transferee under Fla. Stat. § 726.109(2)(a).

132.     Mellerski, Transfer Trust and OWM are first transferees of the Transfers under Fla. Stat. § 726.109(2)(a) as follows: (a) Mellerski, in the amount of the Mellerski Distribution; (b) Transfer Trust, in the amount of the Transfer Trust Distribution; and (c) OWM, in the amount of the OWM Distribution.

133.     Ossenmacher (or, in the alternative, Ossenmacher Jr.) is the person for whose benefit the Transfers were made.

134.     Ossenmacher (or, in the alternative, Ossenmacher Jr.) is the first transferee of the Transfers in the amount of the Transfer Trust Distribution because, as more specifically alleged in paragraphs 71-75, Ossenmacher is the alter ego of Transfer Trust, so its status as a first transferee is imputed to Ossenmacher (or, in the alternative, Ossenmacher Jr.) personally.

**Count V**
**(In the alternative to Count IV)**

**Recovery of Fraudulent Transfers**
**Fla. Stat. § 726.109(2)(a) and (b)**
**[Against all Defendants]**

135.     Plaintiffs reallege the allegations in paragraphs 1-128 as paragraph 135.

136.     To the extent that the Golfview Road Land Trust is adjudged not to be a mere conduit for the Transfers, then the Golfview Road Land Trust is the first transferee of the Transfers under Fla. Stat. § 726.109(2)(a).

137.     Mellerski, Transfer Trust and OWM are the persons for whose benefit the Transfers were made. In the alternative, Mellerski, Transfer Trust and OWM are subsequent transferees under Fla. Stat. § 726.109(2)(b) who did not receive their respective disbursements in good faith or for value.

138.     Ossenmacher (or, in the alternative, Ossenmacher Jr.) is the person for whose benefit the Transfers were made because, as more specifically alleged in paragraphs 71-75, Ossenmacher is the alter ego of Transfer Trust, so its status as the person for whose benefit the Transfers were made is imputed to Ossenmacher (or, in the alternative, Ossenmacher Jr.) personally. In the alternative, Ossenmacher (or, in the alternative, Ossenmacher Jr.) is a subsequent transferee who did not receive his disbursement in good faith or for value.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

1.     Finding that the Digital Trust was merely a pseudonym for Ossenmacher personally, or, to the extent that Ossenmacher used the Digital Trust as a fictitious name for, or reference to, CFH, that CFH was the alter ego of Ossenmacher, such that all acts taken in the name of the Digital Trust/CFH were acts of Ossenmacher personally, and therefore—

31

(a)    The interests in the Golfview Road Property created by the 2014 Sale Contract and the 2016 Sale Contract are deemed to be property of Ossenmacher individually, and thus Ossenmacher is the "debtor" within the meaning of Fla. Stat. § 726.102(7), and thus Ossenmacher's interests in the Golfview Road Property created by the 2014 Sale Contract and the 2016 Sale Contract were "assets" within the meaning of Fla. Stat. § 726.102(2); and

(b)    The 2014 Contract Assignment and the 2016 Contract Assignment are deemed to be modes by which Ossenmacher individually, the debtor, disposed of or parted with assets—namely his rights under the 2014 Sale Contract and the 2016 Sale Contract and his interest in the Golfview Road Property—and thus were "transfers" within the meaning of Fla. Stat. § 726.102(14).

2.    Finding the Transfers to be avoidable under Fla. Stat. §§ 726.105(1)(a), 726.105(1)(b) and/or 726.106(1), and avoiding the Transfers pursuant to Fla. Stat. § 726.108(1)(a).

3.    Finding that Golfview Road Land Trust was merely a conduit through which Ossenmacher made the Transfers, and consequently, Mellerski, Transfer Trust and OWM are first transferees within the meaning of Fla. Stat. § 726.109(2)(a), and that Ossenmacher (or, in the alternative, Ossenmacher Jr.) was the person for whose benefit the Transfers were made.

4.    In the alternative to the relief requested by paragraph 3, to the extent that the Court finds that Golfview Road Land Trust was not merely a conduit through which Ossenmacher made the Transfers but instead is the first transferee within the meaning of Fla. Stat. § 726.109(2)(a), finding that—

(a)    Mellerski, Transfer Trust and OWM are persons for whose benefit the Transfers were made within the meaning of Fla. Stat. § 726.109(2)(a), or, in the alternative, subsequent transferees within the meaning of Fla. Stat. § 726.109(2)(b) who did not take for value or in good faith; and

(b)    Ossenmacher (or, in the alternative, Ossenmacher Jr.) was the person for whose benefit the Transfers were made within the meaning of Fla. Stat. § 726.109(2)(a), or, in the alternative, a subsequent transferee within the meaning of Fla. Stat. § 726.109(2)(b) who did not take for value or in good faith.

5.    Finding that Transfer Trust was the alter ego of Ossenmacher (or, in the alternative, of Ossenmacher Jr.), such that all acts taken in the name of Transfer Trust were acts of Ossenmacher and/or Ossenmacher Jr.

personally, and Ossenmacher and/or Ossenmacher Jr. is individually liable for any judgment against Transfer Trust.

6. Recovering the value of the Transfers, pursuant to Fla. Stat. § 726.109(2)(a) and (b), as follows—

    (a) Against Mellerski, judgment in the amount of $1,350,000 (i.e., the Mellerski Distribution), together with an award of pre- and post-judgment interest at the rates allowed by law;

    (b) Against Transfer Trust and Ossenmacher, as the alter ego of Transfer Trust, judgment in the amount of $1,957,564.13 (i.e., the Transfer Trust Distribution), together with an award of pre- and post-judgment interest at the rates allowed by law;

    (c) In the alternative to the relief requested by paragraph 6(b), against Transfer Trust and Ossenmacher Jr., as the alter ego of Transfer Trust, judgment in the amount of $1,957,564.13 (i.e., the Transfer Trust Distribution), together with an award of pre- and post-judgment interest at the rates allowed by law; and

    (d) Against OWM, judgment in the amount of $75,000 (i.e., the OWM Distribution), together with an award of pre- and post-judgment interest at the rates allowed by law.

7. Enjoining each defendant, preliminarily and permanently, pursuant to Fla. Stat. § 726.108(1)(c)(1), from disposing of the proceeds of the Transfers and any other property until the SDNY Judgment is satisfied.

8. Levying execution on Ossenmacher pursuant to Fla. Stat. § 726.108(2), as to the Transfers and the proceeds of the Transfers in the amount of $3,447,564.13.

9. Granting such further relief as the Court deems just and proper, including as specifically authorized by Fla. Stat. § 726.108(1)(c)(3).

Dated: March 11, 2022                Respectfully submitted,

FOX ROTHSCHILD LLP
777 S. Flagler Drive
Suite 1700—West Tower
West Palm Beach, FL 33401
Tel.: (561) 804-4419

By:    *s/Heather L. Ries*
       Heather L. Ries
       FBN: 581933
       hries@foxrothschild.com

wpbeservice@foxrothschild.com

Katten Muchin Rosenman LLP
525 W. Monroe St.
Chicago, IL 60661
Tel.: (312) 902-5665

By:     Terence G. Banich (*pro hac vice* to be filed)
        Illinois Bar No.: 6269359
        terence.banich@katten.com

*Attorneys for Plaintiffs*
Capitol Records, LLC and Capitol CMG, Inc.